**Joseph A. AMATO, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. No. 94–0553–S–BLW.**

United States District Court, D. Idaho.

March 11, 1999.

---

Richard E. Weston, Weston & Richardson, Boise, IA, for Joseph A. Amato.

Richard R. Ward, William T. Murphy, U.S. Dept. of Justice, Washington, DC, for U.S.

Peter J. Boyd, Boise, ID, for Angeline A. King, Richard S. Lavin.

William F. Gigray, Jr., Gigray Miller & Downen, Caldwell, ID, for Judy A. Wood.

Richard B. Eismann, Eismann Law Offices, Nampa, ID, for Joyce Jorgenson.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WINMILL, District Judge.

### INTRODUCTION

The Court held a Court trial in this matter on February 22–23, 1999. The Court finds that Judy Wood did agree to the sale of the subject property to Joyce Jorgenson. The Court will order specific performance of the Real Estate Contract, and will specify the order of distribution of the sale proceeds. These and other findings of fact and conclusions of law are set out below pursuant to Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

1. On March 9, 1976, Home Federal Savings & Loan Association of Nampa, Idaho held a mortgage on certain real property located in Canyon County, Idaho, and more particularly described on pages one and two of the Real Estate Contract dated January 27, 1989 and admitted as exhibit 1003.

2. On November 6, 1985, this property was acquired by Walter R. King (now deceased) and his wife Angeline King, along with Richard Lavin and his wife Judy Wood at a Sheriff's Sale.

3. The Kings, Lavin, and Wood purchased the property subject to Home Federal's mortgage.

4. The Kings held a 50% interest in the subject property, and Richard Lavin and Judy Wood each had a 25% interest in the property.

5. On January 15, 1988, Amato obtained a judgment against the Kings and Lavin in the amount of $85,346, and he recorded that judgment on the same day with the Canyon County Recorder.

6. On July 13, 1988, Lavin and Wood divorced. The court ordered that the community property and debts of the parties be shared equally.

7. On January 27, 1989, the Kings, Lavin, and Wood entered into a Real Estate Contract with Joyce Jorgenson to sell the property to Jorgenson. The Court will discuss this finding in more detail later in this decision.

8. On January 16, 1993, Amato's judgment lien against the Kings and Lavin expired by the terms of Idaho Code § 10–1110.

9. On October 27, 1993, Richard Lavin filed a Chapter 7 bankruptcy in the District of Idaho seeking to discharge, among other debts, the judgment obtained by Amato.[1]

10. Lavin's bankruptcy listed Amato's judgment on Schedule F, and notice was sent to Amato.[2]

---

1. The Court takes judicial notice of Lavin's bankruptcy pursuant to Rule of Evidence 201. The Court indicated to counsel that if the Court considered the bankruptcy, the Court would give counsel a chance to respond. Counsel are free to file a motion to reconsider, and the Court will examine any arguments counsel raise therein. In one sense, the bankruptcy was not a total surprise to Amato's counsel since he had prepared and filed the bankruptcy as Lavin's counsel.

2. Amato testified at the hearing that he did not receive notice of Levin's bankruptcy. However, the Bankruptcy file shows that notice was sent to him. This raises a presumption that proper notice was given, and "the presumption can only be overcome by clear and convincing evidence that the mailing was not, in fact, accomplished." *In re Bucknum*, 951 F.2d 204, 207 (9th Cir.1991). The creditor's allegation that he did not receive the

11. On February 2, 1994, the Bankruptcy Court for the District of Idaho discharged Amato's judgment against Lavin.

12. On May 18, 1994, Amato recorded a Renewed Judgment against King and Lavin for $112,116.56 with the Canyon County Recorder.

13. On November 25, 1994, the Internal Revenue Service (IRS) recorded a Notice of Federal Tax Lien for the principal sum of $6,313.14 against Richard Lavin with the Canyon County Recorder.

14. Prior to the January 27, 1989, sale of the subject property, and after Wood had separated from Lavin and moved to California, the Kings, Lavin and Wood sold other parcels of real property.

15. In those prior sales, Angelina King would call Wood and get her approval for the sales, and Wood routinely gave her approval. Wood understood that Walter King was ill and that Angelina King needed to liquidate their real estate holdings to cover her increasing financial obligations.

16. Sometime prior to January 27, 1989, Angelina King called Wood and informed her that Jorgenson had offered $100,000 to buy the subject property, and King asked whether Wood would agree to the sale.

17. Wood answered that she was delighted with the price and that she approved of the sale.[3]

18. Attorney Richard Weston drafted a Real Estate Contract that was signed by the Kings, Lavin, and Jorgenson on January 27, 1989.

19. Wood never signed the Real Estate Contract although it was sent to her by Lavin.

20. The Kings, Lavin, and Jorgenson, were all under the reasonable impression that Wood had agreed to the sale, and had signed the Real Estate Contract in California.

21. In reliance thereon, Jorgenson's father, and representative, Wilbur Smith, moved onto the property and spent over $20,000 making numerous improvements to the property as it was in very poor condition at the time.

22. The improvements made by Smith were substantial in relation to the value of the property.

23. In further reliance on Wood's agreement to the sale, Wilbur Smith, as Jorgenson's representative, (1) paid $52,777.97 on the Home Federal mortgage between September of 1988 and February of 1999, (2) paid the Canyon County property tax assessments on the property for the years 1989 through 1991 and 1994 and 1995 in the amount of $3,277.46, and (3) paid the irrigation assessments of the Wilder Irrigation District on the property for the years 1988 through 1997 in the amount of $1,569.82.

24. Wood has never made any payments on the property, and specifically made no payments to cover the mortgage, taxes, or irrigation assessment on the property.

25. The IRS concedes that its federal tax liens for the tax periods ending March 31, 1986, and March 31, 1987, have released and no longer attach to either Richard Lavin's or Judy Wood's interest in the subject property. The IRS continues to assert that its federal tax lien for the June 30, 1987, period attaches to both Lavin's and Wood's interest in the subject property.

notice is not enough, by itself, to overcome the presumption. *Id.*

**3.** The Court finds King's trial testimony very credible on this issue. Wood, on the other hand, did not directly contradict King, but simply testified that she could not remember ever giving her approval to King for the sale of the subject property. King's certainty, Wood's lack of memory, and the prior course of conduct in which Wood gave her approval to King for other land sales, all combined to convince the Court that Wood had given her approval to King for the sale of the subject property to Jorgenson.

26. Jorgenson filed a cross-claim against King, Lavin, and Wood, but has since settled her claims against King and Lavin, leaving only her claims against Wood.

## CONCLUSIONS OF LAW

27. "Formation of a valid contract requires that there be a meeting of the minds as evidenced by a manifestation of mutual intent to contract. This manifestation takes the form of an offer and acceptance." *Inland Title Co. v. Comstock*, 116 Idaho 701, 703, 779 P.2d 15, 17 (1989).

28. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree." Restatement (Second) of Contracts § 50(1) (1979).

29. "A written contract signed by one party only, binds the other party if he accepts the writing." *Gardiner v. Gardiner*, 36 Idaho 664, 669, 214 P. 219, 221 (1923).

30. "The requirements for proper application of quasi or equitable estoppel are that the person against whom it is sought to be applied has previously taken an inconsistent position, with knowledge of the facts and his rights, to the detriment of the person seeking application of the doctrine." *Sun Valley Hot Springs Ranch v. Kelsey*, 131 Idaho 657, 662, 962 P.2d 1041, 1046 (1998).

31. Idaho's statute of frauds, Idaho Code § 9–503, states that "[n]o estate or interest in real property ... can be created ... otherwise than by operation of law, or a conveyance or other instrument in writing."

32. An exception to the statute of frauds is the doctrine of part performance. *See* Idaho Code § 9–504; *Bear Island Water Ass'n Inc. v. Brown*, 125 Idaho 717, 874 P.2d 528 (1994).

33. "Under the doctrine of part performance, when an agreement to convey real property fails to meet the requirements of the statute of frauds ... the agreement may nevertheless be specifically enforced when the purchaser has partly performed the agreement." *Bear Island*, 125 Idaho at 722, 874 P.2d 528.

34. In order for the doctrine of part performance to apply, the proof must show that the contract is complete, definite, and certain in all its material terms. The material terms which must be identified in a contract to convey land include the parties to the contract, the subject matter of the contract, the price or consideration, and a description of the property. *Id.*

35. "What constitutes part performance must depend upon the particular facts of each case and the sufficiency of particular acts is a matter of law." *Id.*

36. "The most important acts which constitute a sufficient part performance are actual possession, permanent and valuable improvements, and these two combined. The acts constituting part performance must be proven by clear and convincing evidence." *Id.* (citations omitted).

37. "Improvements, in order to constitute part performance, must be substantial in relation to the value of the property." *Id.* at 723, 874 P.2d 528.

38. A creditor can collect against the community property of both spouses to pay the separate debt of one spouse. *See Bliss v. Bliss*, 127 Idaho 170, 173, 898 P.2d 1081, 1084 (1995).

39. In the present case, Wood agreed verbally to sell the property to Jorgenson for $100,000, although Wood never signed the Real Estate Contract.

40. The statute of frauds would render Wood's verbal approval meaningless unless the doctrine of part performance takes this case outside the statute of frauds.

41. The Court finds that the doctrine of part performance has been shown to apply to this case by clear and convinc-

ing evidence for the following reasons: (1) In reliance on a reasonable assumption that Wood agreed to the Real Estate Contract, Jorgenson, through her father Wilbur Smith, took open and notorious possession of the property; (2) Jorgenson's possession was never challenged by Wood; (3) Jorgenson paid the down payment of $2,500, the real estate commission of $5,000, the monthly mortgage payments to Home Federal, the Canyon County tax assessments, and the Wilder Irrigation District assessments, all as provided in the Real Estate Contract, while Wood made no payments whatsoever at any time; and (4) Jorgenson made over $20,000 worth of improvements to the property, which were substantial in relation to the value of the property.

42. Although Jorgenson never recorded the Real Estate Contract, her interest is superior to Amato, who recorded his expired lien on May 18, 1994, and the IRS, who recorded its lien on November 25, 1994, because Jorgenson purchased the property and took possession in January, 1989, prior to both of those liens. As the Court held in an earlier decision, a purchaser under an unrecorded real estate contract, who is in physical possession of the property purchased, has priority over subsequent encumbrances, even if the subsequent encumbrances were recorded first. *See Fajen v. Powlus,* 96 Idaho 625, 627–28, 533 P.2d 746, 748 (1975).

43. Therefore, Jorgenson's interest in the property has priority over the judgment lien of Amato and the tax lien of the IRS.

44. The Real Estate Contract provides that Jorgenson is not obligated to make any payments to the sellers until the sellers provide proof that the liens are satisfied.

45. The liens referred to in that provision of the Real Estate Contract are the liens of Amato and the IRS.

46. Because the Court has now determined that Jorgenson's interest in the property has priority over the liens of Amato and the IRS, those liens are essentially "satisfied" as far as Jorgenson is concerned, and the Court will therefore order the specific enforcement of the Real Estate Contract.

47. Jorgenson's cross-claim against Wood represents that Jorgenson is "ready to pay the balance owing on the purchase price of the premises under the subject contract [and][t]he subject contract should be enforced and the sellers should deliver the title as required by the subject contract in exchange of the unpaid balance of the purchase price." The Court will so order.[4]

48. Jorgenson is therefore ordered to pay the balance owing on the purchase price set forth in paragraph 2 of the Real Estate Contract dated January 27, 1989.

49. Upon payment of the balance owing on the purchase price, King, Lavin and Wood shall deliver title to the subject property to Jorgenson.

50. The proceeds of the sale shall be distributed first, to the costs of sale, and second, to Home Federal Savings & Loan Association, Nampa, Idaho to pay off loan number 110003286. The remaining proceeds shall be apportioned as follows: (1) one-half to be distributed first to Joseph Amato to satisfy his judgment lien against King, with any sums remaining distributed to Angelina King; (2) one-fourth to the United States to satisfy the unpaid federal tax liabilities of Richard Lavin, plus accrued interest, penalties, and other statutory additions for the tax period ending

---

4. The Real Estate Contract does not require Jorgenson to immediately pay the entire purchase price but only requires that she begin making the monthly payments specified therein. Thus, the Court's order that the Real Estate Contract be specifically enforced does not require that Jorgenson immediately pay the entire purchase price. However, because Jorgenson has indicated her willingness to pay off the entire purchase price, the Court will so order.

June 30, 1987,[5] with any sums remaining distributed to Richard Lavin; and (3) one-fourth to be distributed first to the United States to pay the federal tax liabilities of Richard Lavin, plus accrued interest, penalties, and other statutory additions, for the tax period ending June 30, 1987, and any sums remaining distributed to Judy Wood.

51. The Court shall enter a separate Judgment as required by Federal Rules of Civil Procedure 52(a) and 58.

## JUDGMENT

Pursuant to the terms of the Findings of Fact and Conclusions of law filed with this Judgment, and pursuant to the dictates of Federal Rules of Civil Procedure 52(a) and 58,

NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that plaintiff Joseph Amato share in the distribution of the sales proceeds as outlined in the Conclusions of Law filed with this Judgment and that in all other respects his prayer for relief contained in his Complaint be DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that Joyce Jorgenson have judgment against Judy Wood on Jorgenson's cross-claim.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that in accordance with the rulings above, (1) Jorgenson's interest in the subject property is declared to be superior to that of Joseph Amato and the Internal Revenue Service, (2) the liens of Amato and the IRS are deemed satisfied as to Jorgenson, (3) the Real Estate Contract dated January 27, 1989, shall be specifically enforced, (4) Jorgenson shall pay the balance owing on the purchase price as set forth in the Real Estate Contract, (5) King, Lavin, and Wood shall transfer title to the subject property to Jorgenson upon Jorgenson's payment of the purchase price, and (6) the sales proceeds shall be distributed as specified in the Conclusions of Law.

---

**5.** As the Court found earlier in this opinion, Lavin discharged Amato's judgment in the bankruptcy. Therefore, Amato may not enforce his judgment against Lavin's share of the proceeds. No party has argued that the IRS liens were discharged in Lavin's Chapter 7 bankruptcy.